IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

GEORGIA ROGERS,

                          Plaintiff,                Case No. 3:07 CV 395

      -vs-

                                           <u>MEMORANDUM  OPINION</u>

DAIMLERCHRYSLER CORP.,

                          Defendant.

KATZ, J.

       This matter is before the Court on Defendant's motion for summary judgment, *pro se* Plaintiff's memorandum in opposition, and Defendant's reply thereto.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  For the reasons that follow Defendant's motion is well taken.

## I. Background

*1. Procedural History*

       In light of this lengthy litigation and for purposes of clarity, the Court deems it necessary to set forth the following history:

       In July 2001, Georgia Rogers ("Rogers") initiated a complaint against Daimler-Chrysler Corporation.  *Rogers v. Daimler-Chrysler*, Case No. 3:01CV7360 (N.D. Ohio) ("*Rogers I"*)*.* Rogers was initially represented by counsel but five months into the litigation counsel moved for and was granted leave to withdraw his representation.  (*Rogers I*, Doc. No. 15.)  After several extensions of time to retain new counsel, the litigation proceeded forward with Rogers representing herself.  In December 2002, Plaintiff was granted dismissal of the action under Fed. R. Civ. P. 41(a)(1).  Contained within that dismissal was the language:

> If no settlement or agreement is reached within one (1)year of the dismissal of the above captioned case, under rule 41 - (A), it is my understanding that I may again file this matter in Federal Court.

(*Rogers I*, Doc. No. 39.)

On December 10, 2003, Plaintiff moved to refile her case (*Rogers 1*, Doc. No. 40) and filed a second case which was ultimately dismissed.[1]

In July 2004, the Court granted Plaintiff's motion and reopened *Rogers I*.  Following discovery and repeated attempts at dismissal on February 10, 2006, the Court issued the following Order:

> Upon the request of Plaintiff and with the consent of Defendant, this matter is dismissed without prejudice pursuant to Fed. R. Civ. P. 41(a); each party to bear their own costs.

(*Rogers I*, Doc. No. 97.)

On February 12, 2007, Rogers filed a third complaint *pro se*.  The complaint is a mirror of those filed in *Rogers I* and  *II*, except for the following handwritten additions:

> After ¶ 11. . .

> After Plaintiff filed charges in July 2001, Defendant fired Plaintiff without just cause effective May 2, 2003.

> Prior to the prayer for relief,

> Ref Cases No. 3:01CV7360 and 3:03CV7743 as part of this action.

---

[1] On December 16, 2003, the *pro se* Plaintiff initiated a second complaint in the district court making the identical allegations as contained in *Rogers I*.  *Rogers v. Daimler-Chrysler*, Case No. 3:03CV7743 (N.D. Ohio) ("*Rogers II*"), which case was assigned to the Hon. James G. Carr.  In July 2004, counsel for defense filed a status report in both *Rogers I and Rogers II* identifying the duplicate cases pending in the district court and containing a request to consolidate the cases. (*Rogers I,* Doc. No. 42, *Rogers II*, Doc. No. 15.)   Judge Carr dismissed the case without prejudice as a duplicate action pending in *Rogers I*.

(*Rogers III*, Doc. No. 1.)

Following the Defendant's motion to dismiss, the Court dismissed  the wrongful discharge

claim and denied dismissal on the remaining claims.  (*Rogers III,* Doc, No. 17.)

2.  *Factual Background*

Georgia Rogers began working for the Defendant's predecessor in 1985 at its Toledo Jeep

facility as an accounting clerk or timekeeper.   In the late 1980s, Chrysler decided to consolidate its

accounting functions into a division entitled Manufacturing Group Accounting ("MGA") which

would function out of its Sterling Heights Assembly Plant ("SHAP").  Ms. Rogers was offered a

transfer to SHAP and advised that her failure to transfer could result in her layoff from the Toledo

facility due to her low seniority status.  As a result, in April 1988, Ms. Rogers was transferred to

SHAP.  In her complaint Ms. Rogers contends that although she was told her accounting duties

would be transferred to SHAP, in fact, those job functions were distributed to other Toledo

workers and performed at the Toledo facility.  (Complaint at ¶ 4.)

During Ms. Rogers tenure at SHAP, she repeatedly but unsuccessfully requested a transfer

back to Toledo.  (Id. at ¶ 6.)  Ms. Rogers alleges she learned that certain dispossessed Jeep workers

could return to Toledo which apparently stemmed from a failure to post such information at the

SHAP.  This posting advised former Toledo assembly plant employees of a possible transfer back

to the Toledo facility and advised them to complete an election form.  (Doc. No. 43, Ex. M.)  Ms.

Rogers requested but was denied a transfer based upon her failure to complete a transfer election

form.

 On June 21, 2000, Ms. Rogers filed a civil rights charge with the Ohio Civil Rights

Commission ("OCRC") based upon her denial of a transfer.  (Gordon Aff. , Attachment 4.)  In

3

November 2000, Ms. Rogers submitted a transfer election form to Chrysler (Doc. No. 43, Ex. R) which was accepted by the Defendant.  (Doc. No. 43, Ex. V.)  The investigation by the OCRC found the June 200 charge by Ms. Rogers to be unsubstantiated and issued a not probable determination as well as a right-to-sue letter dated September 20, 2001.  (Doc. No. 43, Attachment U.)

In 2001, John Ocock ("Ocock"), a Chrysler management employee, spoke with Ms. Rogers at SHAP and learned of Rogers' dissatisfaction with her job.  (Ocock Affid. ¶ 5.)   At the time, Ocock was in charge of the steel offload program[2] and working remotely our of the SHAP in Toledo.   Ocock was in need of someone to perform clerical tasks associated with the program and he concluded that Ms. Rogers, with training and supervision, would be able to perform those tasks. In addition, Ocock was aware that Ms. Rogers was unhappy with her situation at the SHAP and wanted to return to Toledo.  It was Ocock's opinion that Ms. Rogers could remain a SHAP employee but work remotely out of Toledo under his supervision to assist him with the steel offload program.  Ms. Rogers expressed an interest in such a situation. (Rogers Dep. Vol. 2, pp. 70-71.)   Ocock requested and obtained approval for Ms. Rogers to work in a new bargaining unit position, that of off-load analyst under Ocock.  (Ocock Affid., ¶ 5.)

---

[2]

  According to Ocock: "[t]he Steel Offload program is a profit generating project by which Chrysler purchases large quantities of steel and then resells it to non-Chrysler owned stamping facilities.  Those companies/facilities realize a benefit because the price they pay Chrysler is lower than the price they could obtain in the steel market because they cannot buy in the large quantities that Chrysler purchases.  MGA's involvement in this program is ensuring that the steel companies are paid and that the stamping companies are invoiced for their purchased steel. If a dispute arises over an invoice, the stamping company sends a chargeback (debit) which is processed by the MGA."  (Ocock Affid.,¶ 3.)

4

Ms. Rogers commenced her new position in June 2001 working remotely out of Toledo. (Id. at ¶ 6.)  Ocock allowed Ms. Rogers to work a flexible schedule as long as she put in her eight hours a day.  (Id.)  Ocock and Rogers worked on Mondays at the SHAP and then the remainder of the week in Toledo.  (Id.)  Ms. Rogers, under Ocock's supervision, created a handbook/ job description for her new position.  (Id.)

All seemed to go smoothly until October 19, 2001.  On that date, Ocock avers as follows:

> I was teaching Ms. Rogers about a particular computer screen and the program/ screen contained a comment field.  I was standing behind Ms. Rogers, who was seated at her computer.  I told Ms. Rogers to type anything into the comment field–it did not matter what was in the comment field, so long as something was entered in it.  She did not understand what I meant, so I reached around with my right hand and randomly struck a key on the keyboard three times, just so that something would be entered in the field.  I continued my instruction until Ms. Rogers interrupted me and asked me to please type something different.  It was at that point that I looked at the comment field and realized that I had struck the lowercase "k" key and thus had typed "kkk" in the comment field.  I was embarrassed, felt terrible and apologized profusely.  Ms. Rogers and I then continued with the training.  I did not mean to type anything that could be taken as a reference to the Klu Klux Klan on Ms. Rogers' computer.  I heard nothing more from Ms. Rogers about this incident until several months later.

(Ocock Affid. ¶ 7.)

On January 23, 2002, Ms. Rogers filed a charge of discrimination with the OCRC based on race due to conduct by Ocock.  The OCRC made a "no probable cause" finding and issued a right-to-sue letter on January 31, 2003.  (Gordon Affid., Attachments 2 and 3.)

Ms. Rogers continued to work remotely from Toledo until February 2002, at which time she returned to SHAP full-time.  (Ocock Affid., ¶ 8.)   In May 2002, Ms. Rogers' employment was terminated for failure to report to work after a medical leave.  (Rogers Depo., Vol. 1,  Ex. J.)  A claim of wrongful discharge pertaining to this final event was dismissed by the Court in its opinion of September 19, 2007.

## II. Legal Standards Applicable

*A. Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment

6

must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party."  *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried."  *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

*B.  Title VII and Ohio Law*

It is unlawful under federal law for any employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  It is also unlawful under Ohio law "[f]or any employer, because of the . . . sex . . . of any person . . . to discharge without just cause . . . or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or

7

privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A). The Ohio Supreme Court has held that evidence sufficient to support a finding of discrimination under Title VII of the Civil Rights Act of 1964 is necessary before a violation of § 4112.02(A) can be shown. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128, 131 (1981); *see also Little Forest Medical Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St. 3d 607, 609-10, 575 N.E.2d 1164, 1167 (1991), *cert. denied*, 503 U.S. 906 112 S. Ct. 1263, 117 L. Ed. 2d 491 (1992); *El Grande Steak House v. Ohio Civil Rights Comm'n*, 99 Ohio App. 3d 557, 562, 651 N.E.2d 440, 444 (1994); *Twinsburg City Schools v. Ohio Civil Rights Comm'n*, 86 Ohio App. 3d 527, 529, 621 N.E.2d 591, 593 (1993). Therefore, the Court will consider Plaintiff's federal and state claims together.

The employee carries the initial burden of establishing a prima facie case of job status discrimination in employment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). An employee establishes a prima facie case of discrimination by presenting evidence which, when viewed in the light most favorable to her, would permit a reasonable jury to find that she was denied advancement opportunities because of her sex. *Rose v. National Cash Register Corp.*, 703 F.2d 225, 227 (6th Cir. 1983).

She can meet this burden by presenting either direct or circumstantial evidence of discrimination. Direct evidence is found, for instance, where an employer's policy is discriminatory on its face, *see Trans World Airlines, Inc., v. Thurston*, 469 U.S. 111, 121 (1985), or where a corporate decision-maker expressly states a desire to remove employees in the protected group, *see LaPointe v. United Autoworkers Local* 600, 8 F.3d 376, 379-80 (6th Cir. 1993). In

8

direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even had it not been motivated by impermissible discrimination.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45, 109 S. Ct. 1775, 1787-88, 104 L. Ed. 2d 268 (1989) (plurality opinion); *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994).

Where no direct evidence of discrimination exists, an employee can establish her prima facie case by indirect or circumstantial evidence.  In that instance, she must show (1) that she is a member of the protected class; (2) that she was denied opportunities or experienced an adverse employment decision; (3) that she was otherwise qualified; and (4) that other individuals outside the protected class received more favorable treatment.  *See Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 53 (6th Cir. 1990); *Gagné v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 313 (6th Cir. 1989). Where the plaintiff presents only circumstantial evidence of discrimination, the burden of production then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the less favorable treatment.  *See McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. Once the employer has met its burden, the burden shifts back to the employee to show that the employer's stated reason for the less favorable treatment is pretextual.  *Id*. at 804, 93 S. Ct. at 1825.  In circumstantial evidence cases, the burden of persuasion remains at all times with the employee.  *Gagné*, 881 F.2d at 315-16.

### IV.  Discussion

Plaintiff brings claims pursuant to 42 U.S.C. § 2000 and 42 U.S.C. § 1981 for discrimination on the basis of race and sex, along with parallel claims under Ohio Revised Code §

9

4112 et seq.  Her remaining claims are best characterized as: (1) wrongful transfer to the SHAP;

(2) denial of a transfer back to Toledo; (3) harassment; and (4) intentional infliction of emotional

distress.

*A.  Wrongful Transfer*

      The pertinent parts of Plaintiff's complaint are set forth as follows:

      2.  Sometime on or about the date of April 11, 1988, the Plaintiff was transferred to defendant's facility (f.k.a. Jeep) located in Sterling Hts, Michigan.

      3.  The purported reason given to Plaintiff for this transfer was that of a low-seniority lay-off.

      4.  That the Plaintiff who at one time had the title of cost accounting clerk was wrongfully told that she and her job duties were being transferred to Michigan but in fact the same cost accounting job functions remained in Toledo and were distributed among other Jeep workers and which job title and duties the Plaintiff could have still performed in Toledo as opposed to being transferred to Michigan.

(Complaint at p. 3.)

      While these allegations are framed as unfair actions, there is nothing in the pleadings nor

does the Plaintiff, in her response, rely or cite to evidence which establishes that these actions were

based upon her claims brought under Title VII.   Assuming her claim is brought under Title VII,

Plaintiff did not file a charge of discrimination with the requisite administrative agency.  *Strouss v.*

*Michigan Dept. of Corrections*, 250 F.3d 336, 342 (6th Cir. 2001).  Even if this hurdle were met, in

considering the *prima facie* analysis Plaintiff does qualify as a member of the protected class, she

arguably suffered an adverse employment action in the form of a transfer to a less desirable

location, and the Court will assume she was otherwise qualified.  However, there is <u>no</u> evidence

that individuals outside the protected class were given favorable treatment over Plaintiff.  As the

Plaintiff is unable to establish a *prima facie* case of discrimination under the *McDonnell Douglas* paradigm, her claim under Title VII is without merit.

As to her state law claims, Plaintiff's complaint states as follows:

[D]ue to the wilful[sic] and intentional nature of the adverse acts of the Defendant committed against the Plaintiff, the Plaintiff has suffered and anguish and stress and embarasssment[sic].

(Complaint at pp. 4-5.)  Thus, to the extent that Plaintiff's allegations fall under the Ohio Revised Code § 4112.01 through § 4112.99, such claims are barred by a six year statute of limitation. *Cosgrove w. Williamsburg of Cincinnati Mgt. Co.*, 70 Ohio St.3d 281, 638, N.E.2d 991 (1994).  As the Plaintiff's transfer to the SHAP occurred in 1988, any viable claim would have expired in 1994.  As Plaintiff's initial case was not filed until 2001, any claim regarding this wrongful transfer to the SHAP is not viable as a matter of law and must be dismissed.

*B.  Requests to Return to Toledo*

Plaintiff's second claim is in the form of a denial of transfer back to the Toledo facility along with the failure to be apprized of such a procedure:

5. [S]tarting in 1988-9 and to date [Plaintiff] did repeatedly request a transfer back to the Toledo plant facility but to no avail.

7.  That in the year of 1998, the Plaintiff, while working in Michigan was informed of the fact that dispossesed [sic] Jeep workers could return to Toledo and as such the Plaintiff did file charges with the Ohio Civil Rights Commission regarding this differential treatment of her and other similarly situated dispossessed Jeep workers when she was denied such a transfer back to Toledo.

8.  That the Plaintiff was denied other job slots available to her and for which job slots she was competent to perform but the Defendant entity did not allow the Plaintiff to obtain those available jobs at the Toledo site and which if allowed to do so, the Plaintiff would have increased her benefits and job mobility at the Toledo plant.

(Complaint at pp. 3-4.)

11

1.  <u>Denial of Transfers</u>

The Plaintiff indicates making repeated requests to return to Toledo.  Employing the *McDonnell Douglas* analysis, the Plaintiff has not offered specifics as to which positions she applied for, how she was qualified for these positions or who the successful applicants were such that they were outside the protected class.  Plaintiff's allegations that other employees were returned to the same, similar or new positions, without more, are conclusory and fail to establish a cause of action under Title VII or Ohio law.

2.  <u>Failure to Inform Regarding Opportunity to Return to Toledo Facility</u>

The Plaintiff further charges she was not notified regarding an opportunity to apply for a transfer back to Toledo.  When she was advised of the misstep, she applied for a transfer but that request was denied.  She then filed a charge with the OCRC, ultimately resulting in a right-to-sue letter after the Commission issued a "no probable cause" determination on her charge of discrimination.  The right-to-sue letter was issued on September 20, 2001.  After notification from the administrative agency, here the EEOC, a plaintiff has 90 days from receipt of the letter to file suit based upon that charge.  42 U.S.C. § 2000e-5(f).  Therefore, the Plaintiff had until late December 2001, to pursue a claim on this issue.   At the time of her initial suit, *Rogers I*, the Plaintiff received the right-to-sue letter, she was represented by counsel[3], and her complaint was not amended to include this information.

The Defendant contends such claims, whether state or federal, are time-barred under the statute of limitations or the Ohio savings statute.

_____

[3]

   Plaintiff's counsel did not move to withdraw from representation until December 12, 2001, some five months after the litigation was initiated and two and one-half months after the right-to-sue letter was received by Ms. Rogers.

12

As noted previously, the Supreme Court of Ohio in *Cosgrove* held Ohio Rev. Code § 4112.99 to be a remedial statute, thereby subjecting any claims thereunder to Ohio Rev. Code § 2305.07 and a six year statute of limitations.  Therefore, to the extent a 1998 failure to post claim is premised under § 4112.99, it is well outside the applicable statute of limitations.

Ohio's Savings Statute allows for refiling of an action within a year following a timely filed action which is then dismissed without prejudice.  Ohio Rev. Code § 2305.19.  In this case, the parties agreed to a voluntary dismissal without prejudice, with leave to refile in December 2002.  In 2004, Plaintiff re-filed her action, which again was dismissed, without prejudice, on February 10, 2006.  The instant case was filed in February 12, 2007.  However, as recently noted by an Ohio appellate court, "The Supreme Court of Ohio has stated that 'the saving statute can be used only once to refile a case.'" *Conway v. RPM, Inc.*, 2007 Ohio 1007, 2007 WL 701094  No. (8th Dist. 2007), *quoting  Thomas v. Freeman*, 79 Ohio St.3d 221, 227, 680 N.E.2d 997, 1002 (1997).  *See also Hancock v. Kroger Co.*, 103 Ohio App. 3d 266, 268-269, 659 N.E.2d 336, 338 (1995).  Applied to the case at hand, this means that when Plaintiff filed her action in February 2007, her cause of action must have been viable under the applicable statute of limitations since she had refiled once already under the savings clause.

In her response, the Plaintiff indicates that she "was not made aware of her rights until after the statute of limitations" and therefore requests her claims be considered as timely filed.  Contained in the right-to-sue letter was a "Notice of Suit Rights" which stated the timing of filing a federal claims and added, "The time limit for filing suit based on a state claim may be different." (Rogers Dep. Vol. 1, Ex. U.)  Even construing the facts in the light most favorable to the non-movant, it would appear the Plaintiff was on notice of her right to pursue litigation.

13

The Court in *Conway* rejected an equitable estoppel argument, noting that there was a "prohibition against the repeated use of the savings statute [which] could not be waived."  As correctly noted by the Defendant, while Ms. Rogers' refiling of her case (the first time) was within the statute of limitations and an appropriate use of the savings statute, her third complaint is not.  Therefore, any claims under a failure to post theory are prohibited as a matter of law.

Finally, assuming *arguendo* that the Plaintiff could overcome this procedural hurdle, she has failed do demonstrate how she qualified for such a transfer or how the failure to post was discriminatory on the basis of her race or sex.  For example, the posting states that it aimed at:

> establish[ing] a mechanism for former Toledo Assembly Plant employees, who were *indefinitely laid off* and subsequently given preferential hiring consideration in plants covered by the National Production and Maintenance Agreement, to return to Toledo Assembly Plant.

(Rogers Depo, Vol. 1, Ex. M.) (Emphasis added.)  There is no evidence that Ms. Rogers met this qualification.  Moreover, Plaintiff's statements regarding the legal standard are incorrect:

> The burden of proof in this instance does not rest with the plaintiff but with the defendant to establish whether forms were filed timely or eligibility for transfer existed.  This issue must be addressed.

(Pltf's Oppos. at p. 4, ¶ B.)   In the absence of a genuine issue of material fact, her claim is without merit as a matter of law.

*C.  Harassment and Medical Malingering*

Plaintiff's claims on these issues are as follows:

> 6.  That, in addition, the Plaintiff due to the direct acts and actions of the Defendant entity, suffered a medical flare-up of a prior cervical injury due to the Plaintiff being required to do repetitive motions and which injury would not have occurred but for the wrongful transfer to the Michigan plant and which injury has caused her hurt, harm and economic loss.

14

9.  That the Plaintiff is currently being harassed by the Defendant entity regarding her being a medical malingerer and and [sic] bogus attacks on the Plaintiff regarding her attendance and leave history; and this harassment could result in her job termination.

10.  That at all times material herein, the Plaintiff has documented medical evidence that exonerates her from any unexcused medical absences and attendance or leave questions and that this harassment by the Defendant entity is bogus and without merit and is designed and intended to force the Plaintiff to quit or to give the Defendant entity cause to wrongfully discharge her from their employment.

(Complaint at. p. 3-4.)

1.  <u>Medical Flare-Ups</u>

With regard to Plaintiff's alleged medical injuries, she contends that they are related to her transfer to the SHAP "and relevant to the Plaintiff's claims that she suffered maltreatment by her employer as a result of injury and disability over the years."  The Defendant submits these claims are immune under the workers' compensation immunity doctrine.

The appellate court in *Saunders v. Holzer Hosp. Found.*, 176 Ohio App. 3d 274, 282,  891 N.E.2d 1202, 1208 (2008) addressed the workers' compensation immunity concept as follows:

Employers who comply with section 4123.35 of the Revised Code shall not be liable to respond in damages at common law or by statute for any injury, or occupational disease, or bodily condition, received or contracted by any employee *in the course of or arising out of his employment,* or for any death resulting from such injury, occupational disease, or bodily condition occurring during the  period covered by such premium so paid into the state insurance fund, or during the interval the employer is a self-insuring employer, whether or not such injury, occupational disease, bodily condition, or death is compensable under this chapter.

(Emphasis in original.)   Even assuming the Plaintiff sustained her injuries in the course of her employment, Ms. Rogers has not demonstrated the Defendant has not complied with Ohio Rev. Code § 4123.35.  Without any evidence to demonstrate a genuine issue of material fact on the

15

applicability of immunity to the Defendant, any physical injuries are the province of the workers' compensation scheme.  As such, the claims under medical flare-ups are dismissed.

      2.  Harassment

Initially, Plaintiff cites to her perception by the Defendant as that of a medical malingerer, in error.  She appears to consider the harassment by the Defendant to have consisted of this unfair perception as well as creating a hostile work environment.

Courts recognize two types of sexual harassment claims: (1) harassment that creates an offensive or hostile work environment, and (2) quid pro quo harassment, whereby a supervisor demands sexual favors as a condition for job benefits. *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178 (6th Cir. 1992), *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 618 (6th Cir. 1986), *Yates v. Avco Corp.*, 819 F.2d 630, 634 (6th Cir. 1987).  While, as the Supreme Court has instructed, "the labels quid pro quo and hostile work environment are not controlling for purposes of establishing employer liability," they are still relevant to the "threshold question [of] whether a plaintiff can prove discrimination in violation of Title VII." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 753, 765 (1998).

To prove a claim of hostile work environment harassment based upon sexual harassment, a plaintiff-employee must show by a preponderance of the evidence:

> (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability.

*Thornton v. Federal Express Corp.,* 530 F.3d 451, 455 (6th Cir. 2008), citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).   The same *prima facie* analysis is applicable to a claim of

hostile work environment based upon race with the third prong requiring a plaintiff to establish that she was subjected to unwelcome racial harassment.  *See Lindsey v. Whirlpool Corp.*, 2008 WL 4428416 *5 (6th Cir. Oct. 2, 2008).

"A hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000) (citations omitted). In order to find a hostile work environment, "[b]oth an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Id.*

> The court must consider the totality of the circumstances when determining whether, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment. *See Williams*, 187 F.3d at 562. "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether-taken together-the reported incidents make out such a case." *Id.* The work environment as a whole must be considered rather than a focus on individual acts of alleged hostility. *See id.* at 563. Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir.2000). Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

*Id.*

The Defendant requests summary judgment based upon the lack of an actionable claim related to her claim of "medical malingerer."  In addition, the Defendant notes a lack of a charge of discrimination or a right-to-sue letter which presages an action under Title VII.  As for any claim

17

of racial harassment, the complaint is devoid of any events related to her charge of racial

discrimination.  Nor does her opposition to the Defendant's motion contain any reference to

evidence which might support a claim of racial discrimination.  In this instance, the Defendant

goes the extra mile to demonstrate that an incident, which was the subject of a charge of

discrimination, is insufficient to establish a claim of discrimination based upon race.

Ms. Rogers filed a charge of discrimination in January 2002 in which she made the

following claims:

3. I believe that I was subject to unwelcome harassment based upon my race/Black
because:

a) I was subject to unwelcome harassment by John Ocock, supervisor, which has
included typing "KKK" on my computer, physically blocking me, yelling at me,
etc.
b) This harassment occurred because of my race, Black
c) This harassment affected the terms, conditions and privileges of my employment
in that I have not received the proper feedback on my work, denied a key to use for
late work in the office, etc.
d) Respondent knew of the harassment, but has failed to take prompt remedial
action against this harassment.
e) Respondent acted unreasonably under the circumstances.

(Gordon Aff., Attach. 1.)

The Ocock affidavit, previously referenced, indicates this incident was an inadvertent

event.  The OCRC determined that harassment did not occur and referenced witnesses who

indicated that it was Ms. Rogers who exhibited aggressive confrontational behavior towards

Ocock.  (Id. Attach. 2.)   The Plaintiff's response to her claim of a hostile work environment is as

follows:

E.  The Defendant argues that there is no basis for prima facie claim based on the
fact that the Defendant's action did not create an intimidating, hostile or offensive
work environment.  The Plaintiff's repeated requests to be transferred from SHAP
do not suggest she was in a warm and welcoming environment.  Each grievance and

18

discrimination claim that the Plaintiff filed while working for the Defendant was the result of said hostile working environment that was not conductive to high quality work performance.  This is evidence by the filing of the claims themselves.

(Plt's Opp. at p. 5.)

There is no legal standard which requires any workplace to be warm and welcoming; however, the absence thereof is not tantamount to a hostile work environment.  As noted recently by the Sixth Circuit, "occasional comments, which may have been 'offensive utterances,' do not rise to the level required by the Supreme Court's definition of a hostile work environment. . . [t]o hold otherwise would risk changing Title VII into a 'code of workplace civility,' a result we have previously rejected."  *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008) (citations omitted).

In this instance, the Plaintiff has not presented evidence which raises a genuine issue of material fact as to any of her claims regarding harassment.   The Plaintiff did not pursue the claims which were the subject of her January 2002 OCRC charge, as was her right as listed in the February 2003 right-to-sue letter.  Aside from that jurisdictional hurdle and even taking the admissible facts as presented in the light most favorable to the Plaintiff, her claims of harassment under either federal or state law[4] are insufficient to withstand summary judgment.

D.  *Intentional Infliction of Emotional Distress*

To establish a claim for intentional infliction of emotional distress, a plaintiff must establish the following:

(1) that the actor intended to cause emotional distress or knew or should have known that his actions would result in serious emotional distress to the plaintiff; (2) that the conduct complained of has been so outrageous in character and extreme in degree as to go beyond all bounds of decency;

---

[4]

*Pittman v. Cuyahoga Valley Career Ctr.*, 451 F.Supp.2d 905 (N.D. Ohio 2006) (prima facie case of race discrimination is similar under either state or federal law).

(3) that the conduct proximately caused the plaintiff's injury; and
(4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Ashcroft v. Mt. Sinai Medical Ctr.*, 68 Ohio App. 3d 359, 366, 588 N.E.2d 280, 284 (1990); *see*

*also Yeager v. Local Union 20 of Teamsters*, 6 Ohio St. 3d 369, 374-75, 453 N.E.2d 666, 671

(1983).  Specifically, outrageous conduct has been characterized as follows:

> [s]o outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.  The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.  There is no occasion for the law to intervene in every case where someone's feelings are hurt.

*Id.  See also Russ v. TRW, Inc.*, 59 Ohio St. 3d 42, 48, 570 N.E.2d 1076, 1083 (1991).

As applied to the current action, the stress which Plaintiff claims she endured simply does not arise to the level of outrageous conduct.  The Court understands the distress which the Plaintiff perceived, however, when compared to the reasonable person standard employed, they do not exceed the bounds of human decency as denoted above.  Accordingly, Plaintiff's claim on this issue is also without merit.

## V.  CONCLUSION

Historically, *pro se* litigants are afforded extra consideration.  *See Haines v. Kerner,* 404 U.S. 519 (1972).  However, the Court finds instructive the language employed by the court in *Eagle Eye Fishing Corp. v. U.S. Dept. of Commerce,* 20 F.3d 503, 506 (1st Cir. 1994):

[T]he "right of self-representation is not 'a license not to comply with the relevant rules or procedure and substantive law.'" (Citations omitted.)  The Constitution does not require judges–or agencies, for that matter–to take up the slack when a party elects to represent himself.

In this instance, the *pro se* Plaintiff has not met the relevant legal standards to overcome the Defendant's motion for summary judgment.  Based upon the aforementioned reasons, the Defendant's motion for summary judgment (Doc. No. 41) is granted in its entirety.  This case is closed.

IT IS SO ORDERED.

  S/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE
